IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 18, 2002

## MICHAEL A. MADDOX v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Marshall County**
**No. 14759      Charles Lee, Judge**

**No. M2002-00282-CCA-R3-PC - Filed October 16, 2002**

The Petitioner was found guilty by a jury of five counts of sexual battery by an authority figure, a Class C felony, and two counts of aggravated sexual battery, a Class B felony. The trial court sentenced the Petitioner to an effective sixteen-year term. This Court affirmed the Petitioner's conviction and sentence on direct appeal. The Petitioner then filed a petition for post-conviction relief, which the post-conviction court denied. The Petitioner now appeals the denial of post-conviction relief, arguing that his counsel at trial was ineffective. Finding no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Andrew J. Dearing, III, Assistant Public Defender, Shelbyville, Tennessee, for the appellant, Michael A. Maddox.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; William Michael McCown, District Attorney General; and Weakley E. Barnard, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I. FACTS

The following facts were summarized by our Court on direct appeal.

The victim of the offenses was born December 6, 1985, and is the [Petitioner's] adopted daughter. She testified at trial that on certain days in 1998 and 1999 as indicated in the indictments, while she was living at home with the [Petitioner], he fondled her or caused her to fondle him. On various occasions the [Petitioner] fondled the victim's breasts, touched her vagina, rubbed his penis against her vagina,

and/or ejaculated on or near her. The victim did not resist or tell anyone because the [Petitioner] had previously threatened to kill her and her family. The victim's mother testified that the [Petitioner], her husband, often made wild and irrational accusations of infidelity against her. Those accusations were frequently coupled with threats to kill her, the children, and himself. This type of irrational behavior continued for at least two (2) years prior to the time the parties separated in January 1999. At the sentencing hearing Dr. John W. Lancaster testified that the defendant suffered from Acognitive disorders and immaturity . . . .

State v. Michael Anthony Maddox, No. M2000-00193-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 764, at **2-3 (Tenn. Crim. App., Jackson, Sept. 22, 2000) (footnote omitted).

The following evidence was presented at the hearing on the petition for post-conviction relief: The Petitioner, Michael A. Maddox, testified that he gave counsel a list of witnesses that he thought would be helpful in his trial. The Petitioner claimed that counsel failed to interview or subpoena any of the witnesses that the Petitioner suggested to him. He testified that one of the witnesses whom he suggested was "a well known business man and reliable witness" named Billy Cook. According to the Petitioner, Cook would have testified that on at least two of the occasions that the sexual abuse allegedly occurred, the Petitioner was working for Cook. The Petitioner also claimed that Cook would have testified that the Petitioner "was illegally arrested . . . without a warrant in divorce court." The Petitioner testified that Cook was his bondsman and that when he called Cook in this case, "they didn't have no bond yet because there wasn't no warrant there." He testified that on another occasion, Cook went to "bond [the Petitioner] out and they said [the Petitioner] needed to just sit in jail a little bit."

The Petitioner testified that it was possible that on one of the occasions that an offense allegedly occurred, he was working "day labor" in Murfreesboro. He stated that he gave counsel a name and an address of his employer, but counsel did not follow-up. The Petitioner also claimed that he asked counsel to interview Detective Sam Bragg regarding the Petitioner's arrest while he was in divorce court. He stated that Sheriff Helton was also present when he was arrested and that Helton later told him that the arrest was made without a warrant.

The Petitioner testified that during the trial proceedings, he requested that counsel interview all of the State's witnesses. He stated that he provided counsel with specific questions to ask the witnesses. The Petitioner testified that counsel should have questioned the victim regarding an occasion "where she said that [the Petitioner] had sent [his] son outside to take out the garbage. Got her to undress or something which there is no way that could happen. [His] son would have been right back in." The Petitioner stated that he "was only alone with [the victim] and [his] son maybe five or ten times because [he] always worked." The Petitioner testified that counsel should have asked the victim about her description of the trailer and the location of windows in the bedroom where the abuse occurred.

The Petitioner testified that counsel should have questioned the victim concerning her age when the abuse began. According to the Petitioner, the victim testified that the abuse began when

she was five years old, but she could not explain how she was able to relate that particular age to the advent of the abuse. The Petitioner stated that counsel should have questioned the victim concerning whether her mother or the prosecutor told her to say that she was five years old when the abuse began.

The Petitioner testified that he directed counsel to ask the Petitioner's former wife, Tammy Maddox, certain questions at trial. However, the Petitioner claimed that counsel "didn't ask not even half of what [he] told him to ask . . . ." He stated that counsel should have asked Tammy Maddox if prior to the allegations in this case, the Petitioner had caught her having an affair. The Petitioner also testified that counsel should have asked his ex-wife if the allegations arose after she found out that the Petitioner was getting a grant from the Red Cross because he had been "hit in a flood." The Petitioner stated that counsel failed to question him about taking and passing a lie detector test in Alabama. He further testified that he requested that counsel file a motion to suppress a general sessions arrest warrant, but the issue "was never even brought up."

The Petitioner stated that, prior to trial, he called counsel "two or three times" to set up meetings, but counsel told him meetings were "not necessary." He testified that, prior to trial, he met with counsel twice for thirty minutes and once for an hour. The Petitioner recalled that at the first meeting, he and counsel discussed "court procedures and everything." He stated that at the second meeting, he informed counsel of the witnesses whom he thought should be examined at trial. The Petitioner testified that at the third meeting, they discussed "how the trial would go and who they would be calling up and everything." The Petitioner claimed that counsel "did not follow through with who he said he was going to call and all." He testified that he spent a total of approximately two hours with counsel prior to trial.

On cross-examination, the Petitioner acknowledged that a person can be arrested without a warrant where there is reasonable cause. He testified that Billy Cook would have testified that the Petitioner's wife had been unfaithful. The Petitioner stated that he had been arrested twenty-nine times. He claimed that he gave counsel the information about his alleged alibi witnesses on several occasions.

The Petitioner testified that counsel should have asked the victim if the Petitioner taught her "to be a virgin until she got married" and if the Petitioner taught her that she was always "to be fully dressed when she comes out of the shower to never let her dad or mom or brother see her naked or unclothed." The Petitioner stated that counsel should have asked the victim if her mother had told her to say anything that was not true. The Petitioner testified that counsel should have asked the victim about specific parts of her testimony, including testimony concerning a window in the back bedroom which the Petitioner claimed did not exist and testimony concerning a pink rag that the Petitioner allegedly used during one of the incidents. The Petitioner testified that the victim should have been cross-examined about her testimony that her mother and brother were outside playing ball during one of the incidents of abuse. The Petitioner maintained that it was too muddy to play ball in November, December or January.

The Petitioner stated that his ten-year-old son should have been called to testify at trial. However, the Petitioner admitted that he never requested that counsel call the Petitioner's son as a witness. He also testified that counsel should have questioned Dr. John W. Lancaster about how an evaluation of the Petitioner could only take thirty minutes.

The Petitioner stated that counsel should have questioned Tammy Maddox about her motivation to prosecute the Petitioner. He maintained that Ms. Maddox had been cheating on him. The Petitioner admitted that he did not know how Ms. Maddox would respond to the accusation that she had cheated on her husband, but he "would have like[d] to have heard her answer." The Petitioner acknowledged that he testified about his wife's alleged infidelities. The Petitioner testified that counsel also should have questioned Ms. Maddox about allegations that she made threats to have a former husband arrested if he did not sign over custody of their children. However, the Petitioner admitted that he could not prove that she had ever made such allegations. In addition, the Petitioner testified that counsel should have questioned Ms. Maddox regarding whether she had ever had sexual relations with the victim. He claimed that he caught his former wife and the victim having sexual relations.

The Petitioner testified that he received approximately ten or fifteen thousand dollars from the Red Cross as the result of a flood, but Ms. Maddox did not get any of that money. The Petitioner admitted that the Red Cross did not investigate the flood until after he was charged in this case. However, he maintained that the flood money provided Ms. Maddox with motivation to have him prosecuted.

The Petitioner claimed that no medical evidence was presented to support the State's case. The Petitioner testified regarding a letter that he wrote to counsel. The letter contains information from the Petitioner that he deemed relevant to his defense, but he admitted that he probably wrote the letter after he was convicted in this case. The Petitioner could not identify any evidence presented at trial that was obtained as the result of his alleged illegal arrest.

Detective Samuel Bragg of the Marshall County Sheriff's Department testified that he was the chief investigator in the Petitioner's case. He stated that he arrested the Petitioner for aggravated child sexual battery on March 19, 1999. Bragg testified that the arrest occurred in the chancery room of the Marshall County courthouse approximately forty-five minutes to an hour after an arrest warrant was issued.

Bragg testified that he knows Billy Cook "very well." He testified that Cook is a bondsman in Marshall County and that Cook also owns a pawn shop. Bragg stated that he spoke to Cook on three or four occasions. According to Bragg, Cook would not have been able to furnish the Petitioner with an alibi.

On cross-examination, Bragg testified that he had an arrest warrant in his pocket when he arrested the Petitioner. He stated that he gave a copy of the warrant to the Petitioner thirty minutes to an hour after the arrest. Bragg testified that he had explained the crimes with which he was

charged to the Petitioner and that he read the Petitioner his rights after they arrived at the Sheriff's Department. He stated that an offense date on the warrant was later amended and approved by a general sessions judge. Bragg testified that he "would imagine" that any reason for a delay in the Petitioner getting a copy of the arrest warrant was caused by time needed to set the bond. He testified that he usually holds onto a warrant until he finishes his arrest report, and then he forwards it to the "booking room."

The Petitioner's trial counsel testified that he had been licensed to practice law in Tennessee for twenty years. Counsel testified that he had represented persons in general sessions, criminal courts and circuit courts in Tennessee. He testified that prior to this case, he had tried a hundred or more cases in front of juries. Counsel stated that one-half to two-thirds of his practice was criminal. Counsel estimated that he had worked on twenty to twenty-five sexual offense cases where he represented the accused.

Counsel testified that he first became involved with this case when the Petitioner visited him on the day before he was arraigned in circuit court. Counsel stated that he was not involved with the Petitioner's representation in general sessions court. He testified he represented the Petitioner between his arraignment in April 1999 until his trial in August 1999. Counsel maintained that he was prepared for trial and that he could not recall anything surprising in the State's case.

Counsel testified that he met with Petitioner on the day of the arraignment, on the day of the plea, and at least a couple of additional times at counsel's office. He estimated that he spent approximately five or six hours with the Petitioner prior to trial. Counsel stated that he was satisfied that he had gathered the information that he needed from the Petitioner to represent him. According to counsel, the Petitioner provided him with the names of several potential witnesses, including that of Billy Cook. Counsel testified that the Petitioner told him about Cook during their first meeting, but that the Petitioner did not suggest that Cook could provide the Petitioner with an alibi. He stated that the Petitioner also suggested that the Petitioner's father could testify regarding a lie detector test that the Petitioner took in Alabama. Counsel testified that the Petitioner did not inform him of any other potential witnesses.

Counsel testified that the results of a polygraph test are not admissible in the courts of the State of Tennessee. He also noted that the polygraph test that the Petitioner wanted admitted into evidence was administered because the Petitioner had been accused of molesting another child in Alabama. He explained that he did not introduce that information because he did not want to "open the door" to the prior charges in Alabama. Counsel explained that the State had filed a pretrial notice seeking to introduce evidence of the polygraph, but counsel successfully fought to keep it out. He testified that he told the Petitioner that it was not in his best interest to have the polygraph information introduced at trial. Counsel stated that the Petitioner mentioned that the victim had been examined in Alabama, and no physical evidence of abuse was found. Regarding both the polygraph and evidence from the victim's medical exam, counsel stated, "I tried to explain to [the Petitioner] that we didn't want the jury to even know about the ordeal in Alabama."

Counsel testified that the Petitioner told him that Billy Cook could testify regarding the Petitioner's arrest. He stated that he explained to the Petitioner "that the grand jury had indicted him. That any problems in the general sessions court were cured by that unless as a result of some sort of illegal arrest the police got evidence, that could be suppressible, but of course that didn't happen." Counsel testified that he was not aware of any evidence that was obtained as a result of the Petitioner's arrest that could have been suppressed. He explained that the Petitioner did not give a statement, and no evidence was collected from the Petitioner. Counsel stated that he had discussed with the Petitioner the possibility of using the information about the wrong date being on the arrest warrant to show the jury that maybe the mother of the victim had given some inconsistent statements. However, Bragg's testimony about the arrest warrant undermined that strategy.

Counsel testified that the first time he heard that the Petitioner wanted to use Cook as an alibi witness was when he received a letter from the Petitioner after his conviction. He stated that the letter was marked "received" in his office in October 1999. Counsel also stated that he had no knowledge of potential alibi witnesses in Murfreesboro until he received the letter.

Counsel testified that in addition to talking to the Petitioner, he also filed a discovery motion, obtained discovery from the State, discussed the case with the State, discussed the case with Detective Bragg, and reviewed the chancery court docket of the Petitioner's divorce. He testified that he obtained reports of the victim's medical exam and a report from "Our Kids"[1] Clinic in Nashville. Counsel acknowledged that he spent a significant amount of time on the investigation during which he interviewed the Petitioner, interviewed Detective Bragg, and reviewed the discovery materials.

Regarding the Petitioner's assertion that he had attempted to make appointments with counsel but was refused, counsel testified that his secretary makes all his appointments. He also stated that the Petitioner had moved as a result of a flood, and counsel did not have the Petitioner's new address. Counsel testified that he tried to contact the Petitioner, but was unsuccessful. Counsel reported that he contracted with the Petitioner to represent him, but he never received any payments from the Petitioner. Counsel opined that the lack of payment might explain the Petitioner's failure to contact counsel. Counsel testified that being able to speak to the Petitioner might have helped in preparing the Petitioner to testify, but that was doubtful.

Counsel acknowledged that he did not ask the victim if the Petitioner taught her to be a virgin or if the Petitioner told her not to be unclothed around other people. However, he stated that he did ask the victim if the Petitioner taught her that if anyone touched her in an inappropriate manner, she should she report it. He believed that the victim answered affirmatively.

Counsel testified that he did not ask the victim's mother if she "put [the victim] up to this." He maintained that it is strategically unsound to ask such a question outright because the witness can

---

[1] Our Kids is a nonprofit clinic that provides medical and psychological services for children who may have experienced physical or sexual abuse or neglect.

simply deny it. He stated that the better approach is to try to use questions that would make the jury think that is what happened. Regarding the Petitioner's comments concerning the window in the Petitioner's bedroom, counsel recalled that the victim testified that during one of the alleged incidents of abuse, she had seen her brother playing outside through a window in the Petitioner's bedroom. Counsel testified that he was able to impeach this testimony through the victim's mother. He stated that the victim's mother testified that it was impossible to see anyone in the back yard from the room where the victim claimed to be during the incident. The Petitioner also testified that the victim could not have seen the backyard from that bedroom.

Counsel testified that he did not specifically ask the victim about a pink rag allegedly used during at least one of the incidents of abuse. Counsel stated,

> What I did cross examine her about the rag was in her testimony she is telling what [the Petitioner] is supposedly doing, what he is doing with his left hand, and what he is doing with his right hand, and she basically ran out of hands or at least that was my take on it, what I was trying to get across to the jury so then I am asking her now where was this rag? Then also later there was some testimony about where [the Petitioner] put the rag that didn't seem consistent with [the victim's] testimony about the positioning of her and [the Petitioner].

Counsel recalled that "there was a lot of talk about the rag and cross examination about the rag."

Counsel testified that it is generally "bad practice" to ask a witness a question to which the attorney does not know the answer. Counsel did not recall asking any questions about the condition of the ground near the Petitioner's home and whether it was muddy. As to the victim's age when the abuse began, counsel stated that testimony about the abuse beginning when the victim was five years old came out only at the sentencing hearing. Counsel testified that he asked the victim how she remembered that she was five or six when the abuse began, but she was unable to give a "satisfactory answer."

Counsel testified that during jury selection, the Petitioner "sort of loudly announced that one of the prospective jurors had been having an affair with his wife." He testified that the strategy in this case was not that the charges were brought because the wife was cheating on him but because the Petitioner wanted visitation with the children. Counsel testified that the Petitioner did not receive his "flood money" until after being indicted.

Counsel testified that the Petitioner told him that he pretended to go to work one day, went back to his house, looked through the bathroom window, and saw his wife engaged in sexual relations with the victim. He stated that he did not question the Petitioner about the alleged abuse by the victim's mother because he did not believe it helped the Petitioner's cause and because the stories "weren't terribly believable." However, he testified that the Petitioner "spontaneously" volunteered the information during the trial.

On cross-examination, counsel testified that he spent between four and six hours with the Petitioner prior to trial. He maintained that he continued to work on the case even though he did not

hear from the Petitioner for a period of time. Counsel testified that he believed that he received phone calls at his office from the Petitioner and that he spoke with the Petitioner on the phone. Counsel acknowledged that he did not speak to the witnesses suggested to him by the Petitioner because he did not believe that they could provide any relevant evidence. Counsel testified that he did not do everything that the Petitioner suggested based on strategical reasons or the rules of evidence.

## II. ANALYSIS

The Petitioner argues that his trial counsel was ineffective. Specifically, the Petitioner argues that counsel failed to interview certain witnesses as requested by the Petitioner, failed to adequately cross-examine the State's witnesses, and failed to file a motion to suppress. In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-203. The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Id. § 40-30-210(f). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to de novo review. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution. Id.; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn.1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim.

App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

We conclude that the Petitioner has failed to show that counsel's representation fell below the range of competence of attorneys in criminal cases. The post-conviction court noted that there is no magic length of time that trial counsel should spend on a case because each case is different. The trial court accredited the testimony of counsel with regard to how much time he spent on the case and found that such amount of time was "enough." The post-conviction court pointed out that none of the witnesses whom the Petitioner claimed could offer him an alibi were present at the hearing. However, it noted that the State presented a witness who testified that even if one of the potential alibi witnesses had been called, the testimony would not have been helpful.

The court stated that the State presented evidence explaining how counsel presented the case and the theory that counsel developed. According to the court, counsel explained why he did not ask some of the questions that were requested by the Petitioner and why he phrased some questions in certain ways. The post-conviction court noted that many of the questions asked by counsel at trial "covered the same ground" as those requested by the Petitioner but were "perhaps more artfully posed." The court acknowledged that some of the questions that counsel chose not to ask would have opened a door "through which the State would drive their Mack truck by implicating the [Petitioner] in allegations of a similar nature in a different state at a different time."

The post-conviction court found that counsel "was prepared to present the case" and that counsel "presented the case under the best theory that he had." The court stated, "The decisions which [counsel] made concerning the method and manner of questioning the witnesses were all trial tactics that the Court will not at this time second guess." In denying the petition, the court found that counsel's "trial preparation as well as presentation exceeded those expected under the minimum standards" set forth by case law.

The evidence does not preponderate against the findings of the trial court. Although the Petitioner argued that counsel should have called certain witnesses to testify, he did not present those witnesses at the post-conviction hearing. Thus, no evidence was presented, other than the Petitioner's own statements, that the suggested witnesses would have helped his case. Regarding the cross-examination of the State's witnesses, the Petitioner failed to show how his suggested questions would have aided his case. Counsel testified that he did not use many of the Petitioner's questions because they would not have been helpful and because the rules of evidence would not permit such questions. It is clear from the record that the questions that counsel chose to ask the State's witnesses were part of his strategy and that counsel's questions certainly were more "artfully posed" than those suggested by the Petitioner. Finally, the Petitioner failed to show that counsel

erred by not filing a motion to suppress. The Petitioner was unable to identify any evidence that should have been suppressed. He did not give a statement to police, and no evidence was taken from him by police as a result of the arrest. The Petitioner has not shown that counsel was ineffective in his representation. Moreover, even assuming that the Petitioner received inadequate representation, we fail to see how the Petitioner was prejudiced in this case.

Accordingly, the judgment of the post-conviction court is AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE